Nov. Term, 1857.

The City of Lafayette, &c. v. Jenners.

*F. M. Finch*, for the appellant.

---

The City of Lafayette and Martin, County Treasurer v. Jenners.

Section 1 of ch. 87 of the Acts of 1855, authorizing incorporated cities and towns to establish public schools within their respective corporate limits, and to levy and collect taxes for their support, is unconstitutional.*

But the constitutional restraint applies only to taxation to pay for tuition: municipal corporations may be authorized to levy and collect taxes to build school-houses; but *it seems* that in such case the assessment should be for the specific object.

*It seems* that a charter where acceptance may be necessary, may be inferred to have been accepted; and that if the citizens act under it, their action may be regarded as an acceptance.

The general law of 1857 for the incorporation of cities is not unconstitutional for want of uniformity in the mode of organization, arising out of the diversity of the municipal corporations that might desire or be compelled to avail themselves of its provisions; nor are the organizations under it void for that reason.

*Friday, January* 22.

APPEAL from the *Tippecanoe* Circuit Court.

Perkins, J.—Application for an injunction. Injunction granted. Appeal to this Court.

The facts of the case are as follows: In 1855, the legislature passed an act entitled "An act to authorize the establishment of free public schools in the incorporated cities and towns of the state of *Indiana.*" The first section of the act reads thus:

"*Be it enacted*, &c.—That the several incorporated cities and towns in this state be and they are hereby authorized

---

* It seems that the whole act must fall with the first section.

and empowered to establish and support public schools within their respective corporate limits, and by an ordi- nance of such corporation to levy and collect such taxes as may be necessary, from time to time, for the support thereof," (1).

Under this section, the city of *Lafayette* levied a tax for the support of public schools within the corporation, and was proceeding to collect it. *Jenners* filed his complaint in the Circuit Court, asking that the city be enjoined from collecting the tax so assessed against him. The injunction, as we have seen, was granted. The sole question presented in the case is, whether the section of the statute above quoted is constitutional; and we can scarcely regard it as an open one.

The act of 1852, 1 R. S. p. 444, § 32, and p. 454, § 130, authorized incorporated cities and towns to levy taxes for the support of public schools, after the public funds had been exhausted; and this Court on all occasions, has held that portion of the act unconstitutional. But what is the difference between it and the section of the act of 1855 which we have quoted? Simply this, and nothing more: —the act of 1852 authorized incorporated cities and towns to levy taxes for the support of their schools, after the public funds should have been exhausted; the act of 1855 authorizes incorporated cities and towns " to levy and collect such taxes as may be necessary, from time to time, for the support" of public schools within their corporate limits. The distinction between the acts is without a difference.

If the legislature cannot, under the constitution, confer upon cities and towns the power to levy taxes to continue the free public schools of the state, how can it confer upon them power to levy taxes to establish and support free public schools? What objection exists to the exercise of the first, that does not exist to the exercise of the second act of power? And what was the objection assigned against the first? It was not that it was conferring upon cities and towns power that they were not adapted to exercise; but that it was attempting to confer upon them power forbidden to be so conferred by the constitution. It was at-

Nov. Term,
1857.

THE CITY OF
LAFAYETTE,
&c.

v.

JENNERS.

tempting to confer upon them power touching a subject as to which the constitution required all power to be exercised by the legislature alone—viz., the subject of furnishing tuition in public schools to the children of the state.

In *Adamson* v. *The Auditor*, &c., 9 Ind. R. 174, this Court, in speaking of the law of 1852, said:

" According to the decision in *Greencastle, &c.,* v. *Black,* 5 Ind. R. 557, the provision in that law authorizing township trustees to assess taxes for paying teachers of common schools, is unconstitutional; because the power of voting taxes for that purpose is vested by the constitution in the legislature alone. As to such taxes, the law must be uniform throughout the state. *Quick* v. *Whitewater Township,* 7 Ind. R. 570.— *Quick* v. *Springfield Township, id.* 636."

The new constitution does not contemplate two systems of free public schools in the state—one under the control of the state, and supported by her trust funds and taxes, and another under the control of the various municipal corporations of the state — the cities, towns, townships, counties, school districts—and supported by taxation by them. This would be remitting us back, practically, to precisely the condition we were in under the old constitution and laws, where the state supported a system of public schools, and authorized the counties, &c., severally to raise additional taxes for schools, if they pleased. The consequence was, the legislature shirked the duty of keeping up an efficient system—contented itself with authorizing the municipal corporations to provide schools at their option —and hence we had, on this subject, no uniform rate of taxation—no uniformity of system—no equality of educational privilege—among the children of the state. To remedy this evil—to give us this uniformity and equality—to secure a united and vigorous, instead of a divided and thus weakened, common school system and interest—to place upon the legislature a compulsion to give us these advantages by its own action, instead of hazarding them with the voluntary action of municipal corporations—the new constitution provides that it shall be the duty of the gene-

ral assembly to provide by law for a (one) "general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all." The system must operate equally in city and country, or it would not be uniform. The citizens of the city must be taxed to support it equally with those of the country. Their children must have the right to attend the schools under the system in the city. And if another set of public schools can be maintained in the corporation by taxation, either concurrently with, or in the vacation of, the state schools, then taxation for the support of public schools is not uniform and equal; for such taxes are levied, in effect, by the state, as the city can only levy them by authority delegated to her by the state; and educational privilege is not made equal, to the children of the state—in short, we will not have, as required by the constitution, one uniform system of common or public schools (for the terms in the statutes and constitution are synonymous), supported by equal taxation, and made equally open to all.

We think the injunction was rightly granted.

It may be observed that the constitutional restraint applies only to moneys raised for tuition. Municipal corporations may be authorized to raise money by taxation to build school-houses, &c.; but, perhaps, the assessment should be for the specific object. Money cannot be raised to pay the salary of teachers.

Another point was made, but it is immaterial in the case. It was, whether the city of *Lafayette* had properly accepted the charter of 1857. A charter, where acceptance may be necessary, may be inferred to have been accepted. If the citizens have acted under the new charter, it might be regarded as an acceptance relating back to the commencement of action under it. See Redf. on Railw. 10.

*Per Curiam.*—The judgment is affirmed with costs.

*R. C. Gregory, H. W. Chase* and *J. A. Wilstach*, for the appellants (2).

*W. M. Jenners*, for himself.

(1) Acts of 1855, p. 184.
(2) See notes to the opinion on petition for rehearing.

*[margin:]* Nov. Term, 1857.

THE CITY OF LAFAYETTE, &c.
v.
JENNERS.

Nov. Term,
1857.

The City of
Lafayette,
&c.
v.
Jenners.

Monday,
April 6.

The same Case.

ON Petition for a Rehearing.

Perkins, J.—In this case an earnest petition for a rehearing has been filed; and while the Court consider that the question involved has been so fully presented in the opinions delivered in previous cases in which it has arisen, that its reexamination is a work of supererogation; yet, respect for the able counsel who ask the rehearing, and for the people of the cities and towns who are so deeply interested in the subject, induces us to depart from the usual practice, in cases where the Court is satisfied with the decision rendered, of simply overruling the petition, and to again briefly review the points presented.

The constitution of *Indiana* ordains that the general assembly shall " provide, by law, for a general and uniform system of common schools, wherein tuition shall be without charge and equally open to all." § 1, art. 8. It also ordains that that " assembly shall provide for the election by the voters of the state, of a state superintendent of public instruction." § 8, art. 8. Now the question presents itself, what is the meaning to be given to these constitutional provisions?

Judge Hovey, himself a prominent member of the convention that framed them, as was Judge Pettit, who decided the case at bar below, in delivering the opinion of this Court in *Greencastle Township, &c.*, v. *Black*, in 1854, said:

" It was evidently the intention of the framers of the constitution to place the common school system under the direct control and supervision of the state, and make it a *quasi* department of the state government."

Judge Stuart, in the same case, said:

" Common schools are thus to be established as a state institution, under the superintendent of public instruction as its official head, and to be supported, as to *tuition*, by state funds."

Judge Gookins, in delivering the opinion of the Court, in 1856, in *Quick* v. *Springfield Township*, said:

" The people of the state were seeking, by a constitution, to devise a system which should convey the means of instruction [in common schools], equally to every child in the state." 7 Ind. R. 636.

And again, in *Quick* v. *Whitewater Township*, the Court said, that the constitution had " made the [common school] education of the children of the state, a public duty of the state." 7 Ind. R. 570.

And again, in 1857, in *Adamson* v. *The Auditor*, &c., the Court said:

" According to the decision in *Greencastle Township* v. *Black*, 5 Ind. R. 557, the provision in that law [the school law,] authorizing township trustees to assess taxes for paying teachers of common schools, is unconstitutional, because the power of voting taxes for that purpose is vested by the constitution in the legislature alone. As to such taxes, the law must be uniform throughout the state." 9 Ind. R. 174 (1).

Thus far the case rests upon the provisions of the constitution we have quoted. They enjoin one general uniform system of common schools; which, to be such, all admit, must operate alike in town and country. No other provision was needed in that instrument to produce such a system.

But it does contain another provision, viz., that the general assembly shall not pass any local or special law providing for the support of common schools. § 22, art. 4.

And the questions arise, why was that prohibitory section inserted? To what was it addressed? What was its design? It was not to establish a general system of common schools; for that had already been plainly provided for. What was its object? What could it be addressed to but city and town schools? We cannot suppose that in so carefully considered an instrument as a state constitution, it was inserted without aim, without some meaning. What was it?

The question is easily answered, when considered in the

Nov. Term,
1857.

The City of
Lafayette,
&c.

v.

Jenners.

light of history. Under our former constitution, we had had two systems of common schools, the general and the local, and the local had broken down the general system, and neither had flourished. See *Greencastle Township* v. *Black, supra.* This was an evil distinctly in the view of the convention which framed the new constitution; and it was determined that the two systems should no longer cöexist; that the one general system should be continued, strengthened by additional aids; and that the counteracting local system should go out of existence—should cease.

We have said that under the former constitution, the local school system broke down the general one; and the same would be the result were both tolerated under the present constitution. An ordinary amount of knowledge of human nature, and the motives that govern legislative bodies, must suffice to convince any one of this fact. The constituents of members representing counties having towns and cities which had adopted the local system would, to a great extent, prefer to have no other to interfere with that; they would have no interest in keeping up the general system; and hence, their representatives would naturally unite with the enemies of that system in the legislature, to render it inefficient, merely nominal; and, under such influences, it would wither, if not die. While, on the other hand, if to obtain schools for their own constituents, they were compelled to vote them to all the people of the state, the efficiency and permanency, as well as equality and uniformity of the general system would be maintained.

The question next occurs, is the act of 1855, authorizing cities and towns to pay teachers of common schools by taxation of the citizens, a local law?

The Court is not insensible to the difficulty of determining, in many cases under our constitution, what constitutes such a law. The question is often one of much embarrassment, and few authorities are found to aid in its solution. But in the present case, it would seem that there could be but little difficulty in arriving at a correct conclusion. The subject of the act of 1855, it will be observed, is not the organization of city and town corporations, but the main-

tenance of public or common schools, and taxation for that
purpose. And we have seen that common schools as a
whole, are made a state institution—a system coextensive
with the state, embracing within it every citizen, every foot
of territory, and all the taxable property in the state. The
whole territory of the state is divided into school districts,
under the general school system, including the towns and
cities—they are school districts. Now, a law that is less
general than the single subject upon which it is to operate,
cannot, as a general rule, certainly, be a general law. But,
on the other hand, if it be as general as that subject, it cer-
tainly will, as a general rule, be a general law.

Here, as we have seen, the subject is common schools.
The subject embraces all the persons and all the property
of the state. Yet this law of 1855 operates, and is design-
ed to operate, only upon a portion of the persons and pro-
perty of the state; to be operative only in a part of the
school districts. The state is divided into districts for com-
mon school purposes. The cities and towns form a part
of the districts, and must do so, to render the school sys-
tem general and uniform. Now, suppose the school law
in terms provided that taxation for common schools, and
the management of the system, should be uniform except
in that portion of the school districts situated in towns and
cities; but that in such districts, a tax, additional to that
levied in the rural districts, might be imposed, and a differ-
ent organization and management of the schools adopted;
would any one pretend that the law thus framed was uni-
form in its operation as required by the constitution, and
not local? See *The State* v. *Barbee*, 3 Ind. R. 258. Yet,
such is the school law of the state, if the act of 1855 is a
part of it; for the additional taxes levied by cities and
towns for school purposes, are levied only by virtue of that
law of the state specially authorizing them. It constitutes
one law, one scale of taxation, for one part of the school
districts, and another for the other part. But here we are
met with the argument that cities and towns are, in a mea-
sure, independent governments, *imperia in imperio*, and may
be indefinitely endowed with the power of taxation.

Nov. Term,
1857.

THE CITY OF
LAFAYETTE,
&c.
v.
JENNERS.

Nov. Term,
1857.

THE CITY OF
LAFAYETTE,
&c.
v.
JENNERS.

We admit that great powers may be conferred upon municipal corporations for corporate purposes within constitutional limits. *The City of Aurora* v. *West*, 9 Ind. R. 74. But the state cannot confer upon such corporations the right to do that which the constitution forbids to be done by any power in the state.

Yet, by the law of 1855, an attempt to confer such right is made. The constitution provides that common or free public schools shall be supported by state taxation alone—supported, as a state system, by a uniform and general law. Taxes, therefore, levied for the support of such schools, are levied for a state purpose, not a city or town purpose. Now, if the constitution requires all taxes for such purpose to be levied by a general, uniform law, operating alike upon all the persons and property of the state, and forbids the passage of any other, can the state authorize municipal corporations to raise taxes for such state purpose, in addition to those raised by the general law of the state, thus destroying the uniformity of the school system and taxation for its support, and evading the constitutional restriction? If so, surely constitutional checks are worthless. We have not been able, as yet, to reconcile our consciences to this mode of trifling with the fundamental law of the state.

The state legislature cannot charter towns and cities to carry on common schools. They must be carried on by the state. Can the legislature under our constitution, charter cities and towns with the power to create banks?

Here, we might close this opinion; but it is due, perhaps, to counsel, that we should notice two or three inconveniences which it is suggested must arise from this decision.

1. It is claimed that it will annihilate all colleges and academies. This is not so. The constitution limits the general legislation involved in this decision to common schools. Colleges, academies, and charitable associations, are not included within the ordinary or technical meaning of the term common schools. The state is left, by her constitution, free to encourage education, to any extent she may deem expedient, by such agencies.

2. It is said, if cities and towns cannot tax for common schools, neither can they for streets, &c. This is not so. The constitution says laws on the subject of highways shall be general. It does not so provide as to streets, and a highway is not a street, either technically or in common parlance. This has been judicially settled by this Court. *The Common Council of Indianapolis* v. *Croas*, 7 Ind. R. 9.

And here we cannot refrain from using the example put, to illustrate the correctness of the decision we have made. The constitution says there shall be one general, uniform system of common schools for all the children of the state, and that no local law shall be passed on the subject.

The constitution does not say that there shall be one general system of highways extending into every part of the state, and that there shall be no other. It simply says there shall be no local laws for opening, working on, and laying out highways, where highways may be needed. The constitution enjoins no system of highways, but regulations as to working, &c. Statutory highways are not needed in cities, because streets there take their place; and streets are recognized in the constitution and statutes as existencies distinct from highways. 1 R. S. p. 52.—2 R. S. p. 339. A general law for highways, where they are needed, like one touching county seats, need only be as general as the particular subject-matter, to comply with the constitution.

3. It is said that schools cannot be kept up in cities without local taxation. We are unable to see why. As the proceeds of taxation are, or may be, drawn from the treasury of the state *per capita*, that is, upon the heads of the children, cities would seem to have the advantage, as the great mass of floating population is within their limits. All this, however, is matter for legislative regulation within constitutional restrictions. It is not a question for the Court.

4. The Court is charged, in annulling this law, with disrespect to the legislature which enacted it. The Court knows its duty, touching this point, and will not hesitate

Nov. Term,
1857.

THE CITY OF
LAFAYETTE,
&c.
v.
JENNERS.

to do it.  It is the duty of the Court to respect the acts of the other departments of the government—to regard them, *prima facie*, as legal—to hesitate long, and weigh them well before it overthrows them.  Those acts constitute, in the language of Judge McKINNEY, in *Hedley* v. *The Board of Commissioners, &c.*, 4 Blackf. 116, "persuasive arguments;" still they are, in a sense, but arguments, and do not absolve the Court from the obligation to think for itself and decide for itself, in testing them by the paramount law of the land, to which they must conform.  See *Noel* v. *Ewing*, 9 Ind. R. 37.—*Maize* v. *The State*, 4 *id.* 342.—*Beebe* v. *The State*, 6 *id.* 501.—*Whiteneck* v. *The Madison, &c., Co.* 8 *id.* 217.

Another position, briefly alluded to in the former opinion in the case, is urged against the validity of the school tax, viz., that *Lafayette* was not a legal corporation.  It is said, the general law of 1857 for the incorporation of cities is unconstitutional, for want of uniformity in the mode of their organization.

We shall not extend our opinion by elaborating this point.  The act contemplates, as existing at the time of its passage, four classes of municipal corporations that might desire or be compelled to avail themselves of its provisions.

1. Towns under the management of trustees.

2. Towns under the management of a common council.

3. Cities incorporated with special charters under the old constitution, and continuing to act under such incorporation.  See *The City of Aurora* v. *West, supra.*

4. Cities acting under the previous general laws for the incorporation of cities.

These corporations differed in various particulars, one of which was, the officers by which they were governed.  Certain steps were to be taken, in some of them, to bring them under the general law.  There could not be uniformity in the officers who were to take these steps, because it did not in fact, exist in the corporate officers of the different corporations; for example, one town had trustees, one a common council, &c.; and there necessarily existed diversity to

that extent, in making the movements necessary to bring themselves under a uniform system of government. This diversity renders neither the law, nor the organizations under it, void.

*Per Curiam.*—The petition is overruled, with costs.

Counsel the same as above (2).

(1) See, also, *The Trustees, &c.,* v. *Osborne,* 9 Ind. R. 458, and *Rose* v. *Bath Township, ante,* 18.

(2) By counsel for the appellants :

Before the Court will pronounce a statute invalid, its unconstitutionality must appear beyond doubt. *Maize* v. *The State,* 4 Ind. R. 342.—*Stocking* v. *The State,* 7 *id.* 327.—Sedgw. on Stat. and Const. Law, 482.

Where two clauses of the constitution or other text are susceptible of being so construed as to make them harmonious and effectual, the Courts will seek for and adopt such a construction. Sedgw. *supra,* 237, *et seq.*

Where the subject-matter is local, a local law applicable to it is constitutional. *Cash* v. *The Auditor, &c.,* 7 Ind. R. 227.

The power of taxation can be conferred on municipal corporations in this state by any law that shall be general in its operation in all such municipalities: and such a law would not come within any of the restrictions contained in the constitution of this state.

In the case of *The People* v. *The Mayor, &c., of Brooklyn,* 4 Comst. 420, this power came under review. In that case, under the charter of the city of *Brooklyn,* the common council, in the year 1848, caused *Flushing Avenue,* one of the streets of that city, to be graded and paved, at an expense of 20,390 dollars, 25 cents, which, according to a provision in the charter, was assessed upon the owners or occupants of the lands benefited by the improvement, in proportion to the amount of such benefit. After the assessment had been confirmed by the common council, *Griffin* and others, the relators, caused the proceedings to be removed into the Supreme Court of that state, where the proceedings were reversed and the assessment annulled, on the ground that the statute authorizing such assessments was unconstitutional and void. The Court of Appeals reversed the decision, and *Ruggles,* J., in delivering the opinion of the Court says: "For the purpose of ascertaining what has been deemed, on high authority, the nature and extent of the power of taxation vested in the legislatures of the state governments, I refer to the opinion of the late Chief Justice MARSHALL, in the case of the 'Providence Bank* v. *Billings,* 4 Peters, 514, 561, 563:

" 'The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle which has its foundation in society itself. It is granted by all for the benefit of all. It resides in the government as part of itself, and need not be reserved where property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burthens; and that portion must be determined by the legislature. This vital power may be abused; but the interest, wisdom and

Nov. Term,
1857.

REES
v.
SIMONS.

justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation.'

"And, again, in McCulloch v. Maryland, 4 Wheaton, 428, the following observations are found coming from the same high authority: 'It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the object to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the government acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a state, therefore, give to their government a right of taxing themselves and their property; and as the exigencies of the government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislature and the influence of the constituents over their representatives, to guard them against its abuse.'

"And, again, at page 430, he speaks of it, as 'unfit for the judicial department to inquire what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power.'

"Assuming this, as we safely may, to be sound doctrine, it must be conceded that the power of taxation, and of apportioning taxation, or, of assigning to each individual his share of the burthen, is vested exclusively in the legislature, unless this power is limited or restrained by some constitutional provision. The power of taxing and the power of apportioning taxation are identical and inseparable. Taxes cannot be laid without apportionment, and the power of apportionment is therefore unlimited, unless it be restrained as a part of the power of taxation."

In the case of The Madison and Indianapolis Railroad Co. v. Whiteneck, 8 Ind. R., on page 223, PERKINS, J., says: "We proceed, then, to the work of interpretation. In Prigg v. Pennsylvania, 16 Pet. on page 610, it is said, that 'perhaps the safest rule of interpretation [of the constitution], after all, will be found to be to look to the nature and object of the particular powers, duties, and rights, with all the light and aid of contemporary history, and to give to the words of each just such operation and force, consistent with their legitimate meaning, as will fairly secure and attain the end proposed.' To the same effect, Martin v. Hunter, 3 Cond. R. on p. 557; 1 Kent, 448; Federalist, No. 78; Smith on Statutes, p. 418, § 276."